Case No. 13-3324 and 13-3325 National Mining Association et al. and the Murray Energy Corporation et al. v. Secretary of Labor, Mine Safety and Health Administration Argument not to exceed 20 minutes to be shared by the petitioners and 20 minutes for the respondents. Secretary of Labor gets settled. Mr. Chiat, I forgot how you told me to say it. You may proceed for the petitioner. Good morning, Your Honors. May it please the Court, my name is Henry Chiat and I'm here today on behalf of the Mining Association petitioners, in this case, with the firm of Jackson Lewis. Your Honors, this is a Mine Safety Act case. We would submit respectfully that this case begins and ends with the express words of the statute. Is this microphone working okay for you? Yes. We would submit that it begins and ends with the express words of the statute. The regulation standard in question is an expression of a provision of the statute, the pattern of violations provision. It's very clear from the precise language in Section 104 that this statute is based on allegations, beliefs of inspectors that issue initial citations under 104A. If I could interrupt, before we get going on the substance, do we need to know whether we have jurisdiction? I know there are two of you arguing. Are you going to address jurisdiction or is your co-counsel going to address it? Your Honor, I'm going to address jurisdiction and I'm happy to do it right now. That would be great. My co-counsel is going to focus on due process. Jurisdiction is also a matter of the express words of the statute. This statute defines mandatory health and safety standards as certain interim standards in Title II and III and standards that are issued under subchapter of Title I. This regulation slash standard was issued under Title I. In fact, it is issued under the pattern provision in Title I. It is, therefore, under the express words, a standard. It's also a standard which is reviewable in the Circuit Court of Appeals under the provision in 104, placing exclusive jurisdiction for review of standards in the Circuit Courts of Appeal. How do you know that it's a standard as opposed to a regulation? Obviously, there was extensive briefing on this and there's a brochure of seven cases from other circuits that seem to distinguish between standards and regulations. I believe, Your Honor, that this is clearly a provision that requires the rights and duties of the parties to be changed. It mandates actions. This is not a discretionary process. If we look at the criteria that are used, it all talks about must and shall and will. If we look at the program that operators have to adopt, they have to hire people for their safety program that says shall and must and will. These are mandatory requirements, and they're mandatory requirements that are aimed at, according to the government, the Secretary, aimed at improving safety. And they are standards in the traditional sense. They measure things. They measure up the performance of the client operator against the performance that is set forth in these criteria. That is the definition of a standard. It is a standard for many reasons. Most importantly, it's a standard because of the plain words of the statute. This was issued under Section 104B, the patent provision, and that's in Title I, and that's a standard. And it amended a regulation. It's interesting that in this case, it's also a standard under the OSHA law. The Chamber of Commerce case that we cite in our briefs is directly on point. That is a case that held that a targeting mechanism that OSHA had proposed was a standard and had been required to go through rulemaking and held that OSHA was essentially leveraging its regulated parties into adopting safety and health programs that were not required by other rules or standards. And the D.C. Circuit Court of Appeals said that's a standard. It has to go through rulemaking. This is exactly the same magic trick of pulling a rabbit out of the same hat. This rule standard requires more than 300 client operators, according to MSHA's calculation, to adopt management programs. Those management programs include changes in management, include hiring personnel, include all sorts of things that are not required by regulations. The 300 is the MSHA estimate of how many will file those to hope to get an extraordinary exemption and have it be called a mitigating circumstance. This is a standard under every definition of the statute, under every definition of the case law. It is a standard that should have gone through rulemaking. The criteria did not, and the management programs did not, and they are mandatory and binding. Would everything having to do with having a pattern of violations be a standard under your hearing? No, Your Honor. I think if there was a separate rule that required posting, it would not be a traditional standard. It would be more of an administrative regulatory interpretation, say, post this. It's also interesting in terms of what's a standard. The Secretary himself has changed his position on this and, therefore, should not give any deference. Besides, this is not a Chevron 2 case. It's a Chevron 1 case where the words speak directly for themselves. And besides that, the Secretary has interpreted the term history of violations in its civil penalty rules at 30 CFR Part 100 to mean final violations, not allegations, not citations. They've interpreted that provision exactly the right way. Here, they turn around and take history of violations and turn it on its head, and they say violations is equal to citations. It's not. They can't change the words. It's not Alice in Wonderland. They can't make words mean what they want them to mean. Are there other provisions, though, that would suggest that violations has broader meaning than final violations? I don't think so, Your Honor. I mean, we have looked at every provision of the statute that uses this terminology, and I think that in 814, I'm referring to Title 30, 814E, 814B, 816, 813, every one of them, there's a clear distinction between when the Secretary believes or finds allegations and citations and when they're actual violations. There's a very clear distinction. And this Congress wrote this statute with that clearly in mind. Otherwise, everything else is superfluous. And under the canons of interpretation, you can't make the rest of the statute superfluous so that the Secretary can transform the word standards into the words, excuse me, the words violation into the words allegation or citation. But wouldn't your position essentially dreadfully weaken the pattern of violations provision if you had to have only final violations because of the delay that's involved in making the final determination? Your Honor, the industry has no interest in weakening anything that has to do with safety. The industry is committed to preventing all accidents and all injuries. And if you look at any of the websites of the individual petitioners, you'll see massive commitments to safety. But if it takes two years, give or take months, to have a final determination, the pattern of violations will be an outdated pattern by the time that your test is satisfied. I don't think so, Your Honor. First of all, not all violations are contested, only some. And the increase of violations being contested over the last few years is due to the penalty increase that was passed by Congress, not because anybody's trying to take out a particular significant substantial violation or not. But most importantly, most importantly, above all else, the Mind, Safety, and Health Administration's analysis in the preamble demonstrates a tremendous success under pattern of violations one. A huge decrease in citations, in injury rates, in fatality rates. Pattern of violations one, which was based on final citations and which had notice to the mine operator of a potential pattern, which had a 90-day program where you could take the garbage out of the system and say, look at all these 11,000 mistakenly issued citations. It had this ability, and it created a tremendous safety benefit under the admission of the Secretary. I've been in your red light for a while, so I will thank you. Thank you very much, Your Honor. May it please the Court. My name is John McCauley. I represent the Petitioner Murray Energy Corporation and its affiliates in the consolidated case. Congress established a framework with a variety of enforcement tools for the agency to ensure mine safety. And this rule falls well outside that framework. I want to focus on three independent reasons why the Court should invalidate the rule. The first one, which Mr. Chayette touched on a bit, is the agency is now basing pattern of violation issuances on mere allegations by an inspector that a violation has occurred. And it doesn't have the statutory authority to do that. Second, the agency is using a formula to determine what kind and how many violations constitute a pattern. But the formula did not undergo notice of conduct. And third, this rule provides no opportunity for a hearing before a mine operator is placed on POV status and then issued a closure warrant. That violates basic procedural due process. These flaws together mean that this law is going to be over-enforced. It's going to capture not just the mines that really have a pattern of violations and really are a threat, but also mines that don't. It's particularly going to affect large underground coal mines like my client, who employ thousands of miners and are the most heavily regulated segment of the industry. So I'd like to turn to the first argument, which is that this rule exceeds the agency's statutory authority. The agency is authorized to issue a POV notice only if a mine, quote, has a pattern of violations that are significant and substantial. As Mr. Cheyette argued... That's language from POV 1. That's language from the statutory authority, from Section 104E1. That's the predicate for the issuance of a POV notice. And that language, violation, means an established proven violation. We know this by comparing that language with the other enforcement provisions. 104A, which describes what a citation is, says that it's an inspector's belief that a violation has occurred. And in the citation, the inspector must identify the provision alleged to have been violated. Those qualifications, alleged and believed, are unnecessary if a violation includes something that's alleged or believed. Now, the secretary admits that in those instances, that's what violation means, finally. He just argues that elsewhere, it means something different. Therefore, it's ambiguous, and the court should defer under Chevron 2. Now, there's a presumption against reading a statute that way, inconsistently. I think the word is used consistently. But the question here is actually narrower. It's whether 104E, not whether violation means this or that in different provisions, but whether it's susceptible to two different readings than 104E. And it's not. And another way to get at this is to compare it. This statute includes not one but two POV provisions. There's 104E, which we could call the administrative POV. But then there's 108A too. It's the injunctive POV. And those two were drafted together. They were added together in 1977. And they should be read together. And this, I think, goes to Judge Moore's question, which is that does our interpretation of the 104 POV weaken enforcement? And the answer is no, it doesn't. And the reason is that Congress recognized this problem. Congress recognized that, look, under 104, the agency is authorized, through its own administrative process, to determine that a POV exists and then to issue closure orders. But what if the agency needs to act before it's established that a POV exists? Well, Congress provided for that in Section 118A. It said, and it's in clear language, if the secretary B leaves, in fact, whenever the secretary B leaves, that a mine is engaged in a pattern of violation that presents a continuing hazard, then the agency can go to district court and get an injunction or other remedy. And that language, when you contrast it with the 104 POV, is clear. The provision that allows the secretary to act on the basis of a belief is 108, not 104. Moreover, that matches the language in 104A, which describes what a citation is. It's a belief. And so, in a nutshell, the problem with this rule is the agency is trying to do, through 104, what it ought to be doing through 108. And moreover, its reading of 104 would make the 108 POV superfluous. Now, why does this matter? It matters because under 108, unlike the new rule, there's process. The agency has to go before a district judge and make its case, and the mine gets an opportunity to challenge the allegations. That's what we're asking for, is due process before this happens, if the agency's acting on the basis of approving allegations. And secondly, and it's related, that process before the district judge will weed out what we're concerned about, which is over-enforcement. It will focus enforcement on the mines that really pose a threat and not sweep under it like a drab net mines that don't pose a threat. And so that's why 104 should be read to be restricted to final, established violations, and it doesn't weaken safety. Will you be arguing, as you were calling them, the failure to follow the process to have this rule? Do the notice-in-common issue, Your Honor? Right. I will. Yes. And I'd like to turn to that now. So the second problem with this rule is that the agency has promulgated new pattern criteria without notice-in-common. The Act doesn't define what a pattern is. It leaves that as a gap, and it tells the agency to fill it. The agency's filled it with a formula on its website that calculates whether a pattern exists. But unlike the rest of the rule, that formula didn't go through notice-in-common, and that's a basic violation of due process. Isn't that formulation one giving guidance but not finding? It's not in this case, Your Honor. It could be theoretically. It's not in this case. And we know that because, one, it implements the statute. A legislative rule is one that implements the statute, and that's the formula the agency is using to define what a pattern is. There's no definition of a pattern. Unlike in the old rule, there's no definition of what a pattern is anywhere in the statute or anywhere in the rest of the rule in the CFR. And that's why the agency expressly incorporated the formula on its website into the Code of Federal Regulations. And we know that the D.C. Circuit held it broad. Was it incorporated in a binding way, or was it incorporated in a more advisory way, such as these are the factors that we will be considering on others? I believe it's incorporated in a binding way. First, inclusion in the CFR, by definition, means it has legal effect, as the D.C. Circuit held it broad. But in addition to that, when you look at the language in the actual promulgation of the rule, the agency says, these are the criteria we will use to determine whether a mine has a pattern. And that kind of mandatory language establishes that it has binding effect. They're also using it on the online monitoring tool to inform mines whether they're approaching a pattern of violations. Well, if those aren't the criteria, then that notice that they're providing is no good. So isn't that notice helpful to the mines so that they can know where the problem areas are and can test the idea that they are actually having problems in those particular areas? It absolutely is, Your Honor. But only if those are the real criteria. Only if that's what the agency is really using to determine whether there's a pattern. And they are. Recently, it did four enforcement actions. And they say in their brief, in opposition to the motion to stay, that they ran a computer test. Four mines met the quantitative criteria, and they issued four notices. That's a binding rule. It's got to go through notice and comment. I know you're in yellow light or something. Yes. One question. You're representing the Energy, right? That's correct, Your Honor. So the judicial review provision says that the case can be filed in a circuit where the person resides or has his principal place of business. Correct. How do you satisfy that? All of the five petitioners on the Brony side have their principal place of business, which is their headquarters, their nerve center. In St. Clairsville, Ohio. Okay. May I? I haven't touched on due process. May I address that at all? Unfortunately, Your Honor, I absolutely rely on your brief. Okay. Thank you, Your Honor. May it please the Court. My name is Ed Waldman, and I represent the Secretary of Labor. The Secretary administers the Mine Safety and Health Act through the Mine Safety and Health Administration, which is otherwise known as MSHA. The Secretary and I'm sure there are two respondents in this case. POV rule is valid because Section 104E of the Mine Act expressly delegates to the Secretary of Labor the authority to interpret the phrase pattern of violations. So it's a new interpretation of the former definition. The definitions of POV. This is a new interpretation. Is the rule. Correct. It reinterprets. Correct. The statute. Correct. And there wasn't notice and comment? There was notice and comment. The only thing there wasn't notice and comment for was specific numeric criteria. Specific. I'm sorry. I didn't hear the word. Numeric. Numeric criteria. Numeric criteria that show what? Okay. The rule says that the Secretary of Labor once each year has to review the mines, every mine's compliance record in order to determine whether there's a pattern of violations. And the rule sets out eight factors that have to be considered. And then the rule says that specific criteria will be posted on the website, on MSHA's website. So MSHA on its website has posted what it calls screening criteria. People could comment if they went to the website. MSHA has pledged that if and when it changes those numeric criteria, it will allow parties to comment. Correct. It seems that the objection being raised here is more to be the sanctions that can befall a mine owner by virtue of not an established violation. Now, I'm going to use the term counsel did, but a violation that's been established, but a pattern of we think that might be a violation kind of thing. They argue that it's very loosey-goosey, that it's just somebody's intent to check into a violation, but it wouldn't count within the numerical criteria. It could cause a shutdown, an emergency shutdown. What do you say to that? Well. Do you see that correctly? No, Your Honor. It's not exactly a loosey-goosey belief. I'm sure you wouldn't sign on to that. Okay. What it is is a citation or an order issued by an inspector, an MSHA inspector who's a duly authorized representative of the Secretary of Labor. How many of such individuals exist? Inspectors? Sure. I think there's something. Thousands? I think there's about 700. Yeah. Something like that. I'm not exactly certain about that. But there's more than 14,000 mines operating today in the United States, and MSHA is required to inspect underground coal mines four times a year and all other mines two times a year. So they have – they're very busy, yes. But they are authorized representatives of the Secretary of Labor. They conduct these inspections that are required to be conducted by the statute. If one disagrees with what they say, what this particular inspector finds, that will count against the numerical criteria, what due process is there or means to challenge that before you shut down? Well, it's a long way from the issuance of one SNS citation or order to a shutdown, first of all. I think I read from the briefs that it didn't even have to be an SNS. That is not correct. It has to be SNS. In fact, there has to be a pattern of SNS violations before a withdrawal order can be issued. And the argument that the petitioners are raising is that the pattern of SNS violations are determined based on citations and orders, which have not yet become final, whether because they're not contested or because they haven't yet been adjudicated as a binary. What number of SNS violations before you come under this provision? How many SNS violations do you have to incur before you come under the regulation or shutdown? Well, there's a threshold. I'd like to explain how the screening criteria fit, but I'll first answer your question. Fifty under one set or 100 under another set. There are two sets of criteria. Over what time period? Over 12 months. So you'd have to have 50 or 100 SNS violations? Correct. To meet the threshold? Is there an immediate shutdown? No. What's the process? The process of 50 or 100, and it's not just 50 or 100. There also has to be, with 50, you have to meet another criterion, and with 100, you have to meet other criterion as well. And then if you meet either one of those two sets, you satisfy the numeric criteria that are listed in the screening criteria that are published on IMG's website. And that means that the mine will be, quote unquote, further considered for a pattern of violations. That's the criteria posted on the website. And your opponents argue that the screening criteria should have been subjected to notice and comment review and were not. And your opponents also argue that based on four events, all four companies or mines were, in fact, shut down so that they say that further shows that the screening criteria should have been subjected to notice and comment. How do you respond? As I mentioned earlier, there's over 14,000 mines operating today in the United States. Secretary of Labor obviously cannot conduct a qualitative review of the compliance record of every one of those 14,000 mines every year. Secretary uses this numerical screening formula and computer program to weed out mines that are not likely to have a pattern of violations. And it gives the secretary a manageable number of mines to perform a qualitative review on. And that qualitative review is then performed according to the criteria, to the factors that are listed in the rule that was promulgated for submitting to notice and comment. The list of eight factors there. So the numeric screening criteria that were not submitted to notice and comment is simply something that MSHA uses as an internal guide to weed out 98% of 14,000 mines and say, OK, we don't have to look closely at their records. But then MSHA projected that it would end up with about 313, it projected in the first year, mines that would meet one of those two sets of criteria. And then those mines would have opportunities to adopt these corrective action programs, and MSHA would perform its qualitative review on those mines. MSHA ultimately projected that in the course of a year, only three mines would be sanctioned, three out of more than 14,000 would be sanctioned under this rule. And in fact, in the first year that this rule was in effect, MSHA issued four POV notices. So the projection was fairly accurate. To go to a side issue, I know that time will go quickly, and it is an aside for us. You challenged the jurisdiction in this court, and why don't we have jurisdiction? Very simply, Your Honor, it's the clear language of the statute says the court only has jurisdiction to review a mandatory health or safety standard. And this rule is not a mandatory health or safety standard. There's abundant case law which recognizes a distinction between mandatory health and safety standards on the one hand, and ordinary regulations on the other hand. Well, it seems to me that the pattern of violations provision is attacking what MSHA thinks are unsafe mines. And so why isn't it a standard? It's not a standard because MSHA uses it as a yardstick to measure the compliance records of mines with mandatory health and safety standards. It's not a standard itself. It's a device to measure compliance under standards. Isn't it saying that those mines that have a pattern of violations are mines that MSHA is going to go after with a pattern of violations provisions? Yes. And it's violations of health and safety standards. So it seems to me that it falls within the broad definition of standards as opposed to a reporting requirement, which might be a regulatory regulation as opposed to standard. Might be, although there are reporting rules which the Secretary considers to be standards. And whether something is a standard on the one hand or a regulation on the other has very important consequences under the Mine Act completely aside from jurisdiction. And that is, if something is a mandatory health or safety standard, MSHA can cite a violation of it as significant and substantial or as an unmarkable failure. Whereas if something is an ordinary regulation, MSHA cannot attach those designations to the citations and orders. And that distinction comes from the statute or comes from the case? It comes from the statute 104 itself. 104D specifically says that only violations of mandatory health and safety standards may be cited as significant or substantial and as unmarkable failures. Okay, so if you're correct that I think it's 101D does not provide for judicial review in this court, when would your opponents be able to challenge the pattern of violations regulation? They would be able to challenge it in response to an enforcement proceeding that the Secretary brings before the Commission in which the Secretary has actually applied the POV rule to a concrete set of facts. Whereas here on this facial challenge, and in a facial challenge the petitioners have to show that there's no set of circumstances under which the rule could be validly applied and yet their challenges are almost entirely speculative. They speculate that MSHA will not honor its commitment to work with operators prior to the issuance of a POV notice. They speculate that MSHA is going to issue SNS citations and orders that are later overturned. That MSHA is going to predicate a pattern of violations notice on SNS citations and orders that are later overturned. Aren't there Supreme Court cases that say that there should be an opportunity to challenge a standard or regulation before you hazard not complying with it and having an enforcement action brought against you? Yes there are, Your Honor, but this rule doesn't require operators to actually take any action. The only actor upon whom any obligations are imposed by this rule is the Secretary of Labor. Right, but they have to sit back and wait for you to bring an enforcement action against them. No, they are certainly entitled to, on the monitoring tool, keep track and take proactive preventive measures if they so choose. But the way that an operator can avoid a POV notice is simply by complying with the already existing mandatory health and safety standards. In the odd scenario where an in-fine operator believes it is compliant, but the fine inspector who shows up thinks differently. There's an important... I'm sorry. I see that as the problem being argued here. Yes, yes, absolutely, and there's an important point to make about that. The petitioners make a lot out of the error rate with respect to S&S designations, claiming that it's 20% in 2009-10 and 33% in 2011. Let me just say, even accepting that those rates are true, they're misleading because they don't count uncontested. They only talk about overturned rights with respect to contested citations. They don't count all the citations in order so that they never contest. But I guess the point that I really want to make about that is that whatever the error rate is with respect to S&S designations, there's no contention that MSHA inspectors have any difficulty distinguishing a violation from a non-violation. MSHA put evidence into the record and cited it in the preamble, saying that well over 99% of the citations and orders that are issued are ultimately upheld, meaning that the violations themselves are ultimately upheld. Now, even assuming the petitioners are correct that the S&S designations accompany those violations, there's a higher error rate. But the bottom line is the violations themselves are going to be right more than 99% of the time. If an operator simply complies with the mandatory health and safety standards that already exist, they will not receive a citation. Chances of them receiving a citation in error are less than 1%. And if they don't commit a violation in the first place, they won't even run the risk of an erroneous S&S designation. The Supreme Court has held a number of cases, but let me say to begin with, the starting point of the due process issue is this point, which is that ordinarily something less than an evidentiary hearing is sufficient prior to the administrative action. That's what the Supreme Court held in Matthews and in Mack. Now, under Matthews, of course, there's the three-part test. And the Supreme Court also has a case law in the Ewing case and the Hodel case and the Mackey case, which indicates that when the governmental interest is for public safety and health, as it is here, then process can be postponed so long as there is a reasonably prompt and reliable post-deprivation process provided. And the pattern of violations rule and statutory provision are not the only ones which enable withdrawal orders under the Mine Act. Withdrawal orders of exactly the same scope and nature can be issued under Sections 104B and D of the Act. The Secretary has been issuing such withdrawal orders for more than three decades, and courts have consistently upheld withdrawal orders in those circumstances, even though the predicates on which they're based or allegations have upheld those withdrawal orders as needing due process, specifically because the Mine Act does provide for prompt post-deprivation hearings. It requires the Commission, which is the independent adjudicatory body that adjudicates contests to citations and orders of penalties, to take whatever action is necessary to expedite hearings in cases where orders are issued under Section 104. And then there's a separate provision under Section 105B2, which allows an operator that's received a withdrawal order to ask for temporary relief, which is, in effect, a restraining order or a preliminary judge, if it meets certain criteria. Is this provision, the POV provision that we're dealing with, treated any differently in terms of the opportunity for prompt post-imposition hearing? No, it's treated exactly – it will be treated exactly the same. There's no history of it, because prior to the promulgation of this rule, there had never been a POV. Well, actually, there have been two shortly before it was promulgated. But yes, that's the way it's going to be. There's no distinction in the statute. So going back to my question about jurisdiction, if you're correct that 101D does not provide for judicial review here, are you saying that the only way that your opponents can get judicial review is to wait for an enforcement action and go through the administrative process and then bring up their challenge that they've brought to us? No, I'm not saying that, Your Honor. Then what else could they do? They could also go to district court. And whether they can go into district court or not would depend on the specific nature of the challenge, because there is this Thunder Basin case that the Supreme Court issued, which set up a distinction between issues that are wholly collateral to the administrative review scheme set up under the MIND Act as opposed to issues that Congress wanted to channel through the administrative review scheme. So what would they be able to raise in district court? In district court, I think they could raise their APA challenges, because those are not the sort of issues that Congress intended to go through the MIND Act's adjudication procedure. And where would you see a provision that gives the district court jurisdiction to consider, for instance, the APA? The Administrative Procedure Act itself and the federal question. So the APA itself? Well, that doesn't provide the jurisdiction, obviously. But the federal question statute would provide the jurisdiction. But given that this, as I recall, there's a provision in this statute, I'm forgetting the number, that gives two very limited opportunities for, or I guess at least one of them is for the Secretary to go to district court. Both of them. Okay, for both of them. So wouldn't we read in by implication that the district court is not available for people such as petitioners to go into, if the only provision providing for district court jurisdiction is affording the Secretary the opportunity to go to district court? You could read it that way. It hasn't been read that way. Operators have been permitted to bring challenges in the district courts to make arguments that the Supreme Court has, under the Supreme Court's test, are wholly collateral to the MIND Act's administrative review scheme. And one last point I'd like to make about jurisdiction, though, is the actual wording of the statute. My opponent points out the fact that it says promulgated pursuant to Title I in the definition. But in the jurisdictional statute itself, Section 101D, it says, it says mandatory health or safety standard promulgated under this section, meaning Section 101, obviously. And the only way, in fact, that the Secretary can promulgate a standard under the MIND Act is under Section 101. And the Secretary did not promulgate the pattern of violations rule under Section 101, but rather under Section 104 and Section 508. My time has expired, and I will, unless you have any questions, sit down. Thank you. If you could address that last point on the judicial review, because looking at 101D, it does say under this section, which does seem to be 101. I'm happy to hear that. It does say under this section, but a mandatory health or safety standard has to be promulgated under that section. That's how it works. A mandatory health or safety standard is defined in the definitions as anything promulgated under Title I, and it has to go through the notice and comment procedure under 101, and then it is available for review in the court of appeals. So – and in fact, the agency has before promulgated sections of – implemented other sections of Title I, and in both 508 and the court of appeals found jurisdiction, and that was in the Cold Employment Project case in the D.C. Circuit. Could you comment on this – the initial issue you raised, that this, as I understand, would not be a mandatory standard because it's just a benchmark the Secretary may use to identify operators who should get closer scrutiny? Yes, Your Honor. The – I don't agree with that, and the reason is that the role – Everybody who comes into this mathematical formula, are they all subject to closure or all subject to the sanction? Everyone who meets the mathematical formula on the basis of citations is subject to closure when the agency issues another SNS citation, right? And that happens frequently. In 2012, they issued 14,000 citations on a third of them were SNS. Is there evidence, though, that they don't go through the review under the statutory factors? I believe eight statutory factors. You're referring to the factors in the rule itself? Those are not factors or criteria. If you read them, all it says is we'll look at these types of information. We'll consider safety, history, other enforcement actions. It tells you what information they're going to look at. It doesn't tell you what they're looking for. It doesn't tell you what a pattern is. That's only in the formula on the website. The numbers he gave were that there were only four people that ultimately came under after the formula identified, I think he said, somewhere around 300 or 400. Doesn't that suggest that it's the second round that is actually the standard and the first round is just the generalized identifying? Well, Your Honor, those four lines were placed on them, to be clear, because they met the quantitative formula, right? But that wasn't sufficient, right? It was sufficient in those four cases. Didn't they have to also go through the consideration of the other factors? There were no other factors considered except for the existence of so-called mitigating circumstances, which is basically whether the mind has entered into a corrective action program. Now, I'll submit this is irrelevant. It doesn't go to the issue of what is a pattern. That's being conclusively determined by the formula. And the only reason that the mind has to face the choice between getting a POV notice or implementing a burdensome corrective action program is because, in the first instance, it's bound by the formula. It has a pattern. Otherwise, it wouldn't face that choice. Thank you, Your Honor. Thank you, Your Honors. Just to clarify, we're here for two reasons. There are more than 11,000 incorrect SMS violations issued per year. That's ancient statistics. We put them in the brief. We cited them. This return comes back from FOIA from them. It's not our numbers. Those are the numbers that help determine how this pattern criteria is triggered. This pattern criteria doesn't use the word maybe. It reads very clearly, must, shall. When you have this, this will happen. It is the trigger. Under the old rule, M should never pull the trigger. They had 68 potential pattern minds and never pulled the trigger to respond to a question you asked earlier about how this worked. Well, they never pulled the trigger under the old rule. That was their decision. But here, according to your opponent, there were approximately 300 or 400 that satisfied the website factors, but then they evaluated them according to the notice and comment factors and came up with four that wouldn't. I think that's exactly the point of the second reason we're here, Your Honor, because this rule is a leveraging rule just like the one in the Chamber of Commerce. It is a standard that says if you don't do this, we will do this. If you don't adopt these management programs, we will put you on a pattern. And even then, you have to adopt it before we even identify you. You have to do this on your own when you think you might be moving in that direction. According to some of the briefing, this was going to be on the website, the number of violations as they were occurring, so that you would be able to check this out and say, oh, I've got 30 violations. I better be careful now. It's on the website to some extent. They also have injury rates, which are often long. In our own cases, we've gone into MSHA with many, many, many examples of incorrect data on that website. As one of the administrative law judges pointed out, there's overwriting and over-reporting of this information to a huge extent. But it's— Your red light is on, too, but one last question. I asked your co-counsel about his client meeting the judicial review criteria. Do you meet the judicial review criteria if we were to say that this was a 101-D review? In other words, are you bringing students to a place where such a person resides or has a principal place of business? The Ohio and Kentucky mining associations that we represent have their principal places of business here. As do many of the member companies. Do we have to look at the member companies? That's a real question. We have many of the member companies, including Mark Energy, which— But do you have member companies who are from outside the circuit? If so, does that matter? I believe there are member companies all over the country. And I don't think— There are associations for diversity of citizenship purposes. You look at every member of the association. Is that something we should do here? I don't think that applies here when we're given the specific authority to bring an action in a circuit. And, Your Honors, this is a mandatory standard. It does require this trigger-pulling effect. And then when that happens, every one of these program changes has to go into effect to protect yourself, just like the Chamber of Commerce did. That's why we're here, not just for the four, but for the 350. Thank you all for your argument.